This is a *redacted* version of Memorandum Decision and Order Denying Defendant's Motion to Suppress, docket no. 31, entered May 11, 2015

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>v.<br><br>DERRICK ALAN GOBEL,<br><br>       Defendant. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**<br><br><br>Case No. 1:14-cr-00056-DN-PMW-1<br>District Judge David Nuffer |

This matter comes before the Court on Defendant's Motion to Suppress.[1] On February 24, 2015, an evidentiary hearing was held on the motion. The parties briefed the issues and the Court heard final oral argument on May 5, 2015. Having considered the parties' briefs and the evidence presented at the hearing, Defendant's Motion to Suppress is DENIED.

FINDINGS OF FACT.................................................................................................................1
CONCLUSIONS OF LAW .........................................................................................................9
  Statements Made to Agent Howey Are Admissible ..................................................10
  Defendant's Retention of the Cell Phone Is Admissible ...........................................13
  Statements Made to Officer Weekes Are Admissible ...............................................14
  Evidence Found Pursuant to the Search of the Jeep is Admissible ...........................16
ORDER .....................................................................................................................................17

**FINDINGS OF FACT**

On March 19, 2014, Adult Probation and Parole (AP&P) Agent Jeremy Howey twice went to the residence of Kimberly Simonson in order to serve a felony arrest warrant.[2] Ms.

---

[1] Motion to Suppress Evidence ("Motion"), docket no. 9, filed December 5, 2014.
[2] Transcript of evidentiary hearing ("Tr.") at 8, 89.

Simonson was a fugitive because she had absconded supervision for felony drug charges.[3] Agent Howey and at least one other officer including Layton Police Officer Justin Weekes[4] went to Ms. Simonson's residence at approximately 5:00 p.m., but they did not serve the felony arrest warrant at that time because they were unable to locate Ms. Simonson.[5] Police did, however, speak with Ms. Simonson's mother, who confirmed Ms. Simonson was indeed living at the apartment but had left a few minutes before the officers arrived.[6]

After speaking with Ms. Simonson's mother, Agent Howey told the other officers they could leave while he remained in the area and conducted surveillance.[7] Later that evening, Agent Howey observed Ms. Simonson return home and enter her residence.[8] Agent Howey requested additional backup from other AP&P agents and Layton Police.[9] While waiting for backup to arrive, Agent Howey observed a dark-colored Jeep Cherokee. Other officers described the vehicle as being a gray or green Jeep Cherokee.[10] Defendant agrees that all officers were referring to the same vehicle.[11] The Jeep Cherokee, which was later described as the vehicle Defendant and his passenger arrived in, parked in the apartment's parking lot a couple of spaces away from where Agent Howey was parked conducting surveillance.[12] Agent Howey observed nothing unusual about how the vehicle was driven or parked.[13] Two individuals exited the Jeep

---

[3] Tr. at 7, 89.
[4] Tr. at 25.
[5] Tr. at 7, 10, 89.
[6] Tr. at 10, 89.
[7] Tr. at 10.
[8] Tr. at 10-11, 89.
[9] Tr. at 11.
[10] Tr. at 11, 26, 89.
[11] Defendant's Proposed Findings of Fact at 2, docket no. 23, filed April 24, 2015.
[12] Tr. at 11, 89.
[13] Tr. at 23, 89.

and went directly into Ms. Simonson's apartment.[14] These individuals were later identified as Defendant Gobel and Nicholas Vine.[15]

About this time, Layton Police Officer Justin Weekes arrived and also observed Defendant and Mr. Vine walking away from the Jeep.[16] Officer Weekes then ran the Jeep's license plate, as well as Mr. Gobel's and Mr. Vine's individual records, and discovered that Mr. Gobel had some past drug history.[17] Shortly after Officer Weekes' arrival, Layton Officer Michael Sannar also arrived as a backup officer.[18] Approximately ten minutes after the Jeep arrived at the apartment complex, Officers Sannar and Weekes accompanied Agent Howey and other AP&P agents to knock on Ms. Simonson's door.[19]  In accordance with the policies of Adult Probation and Parole, up to six officers were present to assist Agent Howey in serving the arrest warrant upon Ms. Simonson.[20]

Agent Howey knocked on the door.[21] Approximately one or two minutes later, Defendant answered the door.[22] Agent Howey identified himself and the others as the police, explained that he had a warrant for Ms. Simonson's arrest, and asked if she was home.[23] Defendant responded that Ms. Simonson had already left the apartment.[24] Agent Howey told Defendant he had "visually seen Ms. Simonson enter the apartment a few minutes before [he] saw [Mr. Gobel] and

---

[14] Tr. at 23, 89.
[15] Tr. at 14.
[16] Tr. at 26, 90.
[17] Tr. at 31, 91.
[18] Tr. at 30, 90.
[19] Tr. at 30, 90.
[20] Tr. at 9.
[21] Tr. at 12, 90.
[22] Tr. at 12, 90.
[23] Tr. at 12, 90.
[24] Tr. at 12, 90.

his accomplice enter the apartment."[25] Agent Howey believed Defendant had committed a crime

by not being truthful about Ms. Simonson's whereabouts.[26] Agent Howey and other officers

entered the apartment, some of the officers remained outside the apartment, and Officer Sannar

went to look at the Jeep.[27]

Once in the apartment, Agent Howey asked Defendant and Mr. Vine to take a seat on the

couch "to find out what [Mr. Gobel's] involvement was with [Ms. Simonson], and the fact that

he'd lied to me about the fact that she was not there."[28] Although Defendant and Mr. Vine were

not placed in handcuffs, Agent Howey testified they were "detained" and were not permitted to

leave.[29] Neither Defendant nor Mr. Vine ever expressed a desire to leave.[30] At this time,

Defendant and Mr. Vine were not read their *Miranda* rights.[31] A few officers remained with

Defendant and Mr. Vine while other law enforcement officers searched the apartment for Ms.

Simonson.[32] Agent Howey testified that he had other officers remain with Defendant and Mr.

Vine "[s]o that we could interview them after getting Ms. Simonson into custody to find out

what their involvement was with her, and the fact that [Mr. Gobel had] lied to me about the fact

that she was not there."[33] Another reason for the officers remaining with Defendant and Mr.

Vine was a safety concern.[34]

---

[25] Tr. at 12, 90.
[26] Tr. at 13, 90.
[27] Tr. at 14, 28, 30, 90.
[28] Tr. at 14-15, 91.
[29] Tr. at 22, 91, 92.
[30] Tr. at 22, 92.
[31] Tr. at 23, 92.
[32] Tr. at 15, 91.
[33] Tr. at 15, 90.
[34] Tr. at 16, 29, 91-92.

Law enforcement officers searched the apartment and located a bedroom with its light on and its door closed towards the rear of the apartment.[35] Agent Howey called for Ms. Simonson to exit the bedroom.[36] After a few minutes Ms. Simonson exited the bedroom, was brought to the front room, and placed in custody.[37] Agent Howey then interviewed Ms. Simonson, who told him that she had planned to leave the state that night, getting a ride from Defendant and Mr. Vine.[38] The record is silent as to whether officers ever asked Defendant whether he knew that Ms. Simonson was in the bedroom when he answered the front door or whether Defendant knew Ms. Simonson was a fugitive and intended to leave the state with Defendant and Mr. Vine.

While the AP&P agents searched the apartment for Ms. Simonson, Officer Weekes and other law enforcement became aware that Defendant had been recently released from prison.[39] When Agent Howey returned to the front room, a Layton Police officer told Agent Howey that Defendant wanted to speak with him.[40] Agent Howey stated that would be fine, and asked Defendant to step outside of the apartment.[41] Once outside, Agent Howey asked Defendant what he wanted to talk about.[42] Defendant told Agent Howey that he had recently been discharged from prison and that he did not want to go back.[43] Agent Howey asked him what he meant by that.[44] Defendant stated that Layton Police officers were searching his vehicle and that he had a baggie of marijuana and a syringe in the vehicle.[45] At that time Agent Howey asked if they

---

[35] Tr. at 17, 92.
[36] Tr. at 17, 92.
[37] Tr. at 17, 92.
[38] Tr. at 16.
[39] Tr. at 29-30.
[40] Tr. at 18, 92.
[41] Tr. at 18, 92.
[42] Tr. at 19, 92.
[43] Tr. at 19, 92.
[44] Tr. at 19, 92.
[45] Tr. at 19, 92.

would find anything else.[46] Defendant stated "no," and his demeanor then changed abruptly, and he started to jump up and down and use profanity.[47] Defendant then requested to speak with a Layton Police officer, and Agent Howey terminated any further conversation.[48] This conversation lasted one to two minutes.[49] At some point during the conversation, Agent Howey asked Defendant if he had driven the vehicle.[50] Agent Howey took Defendant to one of the Layton police officers so that Defendant could tell the Layton officer what he had just told Agent Howey about drugs in the vehicle.[51] The Layton officer[52] told Agent Howey that they knew about the drugs because they had already called a canine officer while Defendant and Agent Howey were still inside the apartment.[53]

While Defendant and Mr. Vine were with the law enforcement officers inside the apartment, Officer Sannar was conducting an inspection of the Jeep in the parking lot. Officer Sannar saw bolt cutters and other bags in plain view in the back of the Jeep.[54] Officer Sannar believed this to be consistent with burglary tools.[55] Based upon the drug history of Defendant, Mr. Vine, Ms. Simonson, and the sighting of the bolt cutters in the back of the Jeep, Officer

---

[46] Tr. at 19, 92-93.
[47] Tr. at 19, 93.
[48] Tr. at 19, 93.
[49] Tr. at 19, 93.
[50]  Tr. at 32-33.
[51] Tr. at 20, 93.
[52] Although Defendant suggested this "Layton officer" was Officer Weekes, the identity of this "Layton officer" is not clear from the record. Agent Howey testified that after he spoke with the Defendant and Defendant expressed a desire to speak with a Layton police officer, he took Defendant over to a "Layton officer" the "Layton officer informed [him] that they were already aware of the drugs in the vehicle because they had a canine officer called during the time [he] was conducting the search of the apartment." Tr. at 20. There is no discussion about the name of that "Layton officer."
[53] Tr. at 20, 93.
[54] Tr. at 30, 48, 93.
[55] Tr. at 48, 93.

Sannar requested canine assistance.[56] K-9 Officer Kelley responded to the scene after about five minutes.[57] Officer Kelley is a certified police dog handler through Utah's Police Officers Standards and Training (POST) and his dog "Trus" is similarly certified through POST as a police narcotics dog.[58] Both Officer Kelley's and Trus's certifications were current at the time of the incident.[59]

Upon arrival, Officer Kelley was briefed as to the situation and requested to deploy Trus.[60] Officer Kelley deployed Trus, but did so first on two unrelated but nearby vehicles in the apartment parking lot.[61] Officer Kelley did this so as not to single out any particular vehicle or provide an unintentional clue to Trus.[62] Trus did not alert or indicate on either one of these unrelated vehicles.[63]

Officer Kelley next ran Trus around the Jeep, proceeding counterclockwise.[64] Trus did not provide a positive indication for drugs, but he did alert on the back passenger side of the Jeep.[65] Because the rear portion of the Jeep was backed up against some bushes, which prevented Officer Kelley from running Trus around that portion of the vehicle, Officer Kelley returned Trus clockwise back around the Jeep.[66] Trus again alerted on the back passenger door seam and handle, and then gave a final indication by staring.[67] Based upon this positive

---

[56] Tr. at 48, 93.
[57] Tr. at 48, 93.
[58] Tr. at 65, 93.
[59] Tr. at 65-66.
[60] Tr. at 69-70, 93.
[61] Tr. at 70, 93.
[62] Tr. at 70, 93.
[63] Tr. at 70, 94.
[64] Tr. at 70, 94.
[65] Tr. at 71, 94.
[66] Tr. at 71-72, 94.
[67] Tr. at 72, 94.

indication, Layton officers obtained the keys and searched the Jeep without a warrant or consent.[68]

Officers Kelley and Sannar searched the Jeep, starting in the front driver and passenger seats, and worked their way to the rear of the vehicle.[69] Behind the rear passenger seat Officer Kelley found a black and gray backpack.[70] Inside the backpack Officer Kelley located rolling papers, a silver handgun, a cell phone, a blue and black camera bag, and clothing that included boxer shorts.[71] Inside the camera bag Officer Kelley located a syringe with suspected methamphetamine, a baggie of marijuana, and a scale.[72]

At the conclusion of the vehicle search Layton officers conferred regarding how to ascertain ownership of the backpack.[73] They decided that Officer Weekes would return to the apartment and inquire whose cellphone was in the backpack.[74] When Officer Weekes did so, Mr. Vine looked at the cellphone and stated it was not his.[75] Defendant next looked at the cellphone, began to manipulate the phone, and then retained it.[76] This occurred after Agent Howey had asked Defendant to sit down but before Officer Weekes read him his *Miranda* rights.[77] Police asked no questions regarding the other items found in the Jeep.[78]

---

[68] Tr. at 50, 94.
[69] Tr. at 72, 94.
[70] Tr. at 72, 94.
[71] Tr. at 73, 94-95.
[72] Tr. at 74, 94-95.
[73] Tr. at 34-35, 95.
[74] Tr. at 35, 95.
[75] Tr. at 35, 95.
[76] Tr. at 35, 95.
[77] Tr. at 35-36.
[78] Tr. at 35, 95.

Even though police had not requested to speak with him, Defendant approached and asked to speak with Officers Weekes and Hokam.[79] The officers agreed to speak with him and did so in the grass area nearby.[80] Defendant was not handcuffed during this conversation.[81] Before the conversation began Officer Weekes read to Defendant his rights per *Miranda* from a field card.[82] After hearing the *Miranda* warning, Defendant stated that he still wanted to speak to Officer Weekes.[83] During this conversation Defendant admitted ownership of the marijuana and boxer shorts in the backpack, but stated the LSD and methamphetamine belonged to Ms. Simonson.[84] He similarly denied ownership of the gun, but admitted to handling it.[85] Officer Weekes later tested the marijuana and methamphetamine, both of which tested positive.[86] ███████████████████████████████████████████

███████████████████████[87]

## CONCLUSIONS OF LAW

In Defendant's Motion to Suppress, Defendant moves to suppress the following evidence: all statements to Agent Howey; all statements to Officer Weekes; any testimony related to the K9 search of the Jeep; any evidence found pursuant to the search of the Jeep; and any subsequent analysis of the evidence found in the Jeep.[88] However, at final oral argument on May 5, 2015, Defendant stated that he was making only three challenges, and preserving the record on a fourth. The three portions of evidence Defendant now seeks to suppress are: (1) statements made

---

[79] Tr. at 36, 95.
[80] Tr. at 36, 95.
[81] Tr. at 36, 95.
[82] Tr. at 36, 95.
[83] Tr. at 36-37, 95.
[84] Tr. at 37, 95-96.
[85] Tr. at 37, 96.
[86] Tr. at 39, 96.
[87] ███████
[88] Motion at 2.

by Defendant to Agent Howey after Agent Howey asked Defendant what Defendant meant when he told Agent Howey that he had recently been discharged from prison; (2) any action by Defendant claiming ownership of the cell phone; and (3) statements made by Defendant to Officer Weekes. Defendant seeks to preserve the record that he has challenged the search of the Jeep.

<strong>Statements Made to Agent Howey Are Admissible</strong>

Defendant argues that some of his statements to Agent Howey should be suppressed. Specifically, Defendant contends that by asking Defendant what he meant when he said he had recently been released from prison, Agent Howey thereby conducted an improper custodial interrogation of Defendant. This is incorrect.

A "custodial interrogation" takes place when questioning is "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[89] A person is not "in custody" for *Miranda* purposes unless his "freedom of action is curtailed to a degree associated with formal arrest."[90] This determination is based on the totality of the circumstances and whether a reasonable person in the defendant's position would view the situation as equivalent to formal arrest.[91]

Looking at the totality of the circumstances, a reasonable person in Defendant's position would not have believed that his freedom was restricted to a degree associated with a formal arrest. First, the discussion with Agent Howey took place in the grassy area outside the apartment. Courts are less likely to find a suspect "in custody" where he is questioned in "familiar or at least neutral surroundings."[92]

---

[89] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).
[90] *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).
[91] *United States v. Rogers*, 391 F.3d 1165, 1170 (10th Cir.2004).
[92] *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir.1994).

Second, Defendant was not in handcuffs at any point during the questioning.  ████████████████████████████████████████████████████████████ Even though there were several officers present, the lack of restraint commonly associated with formal arrest weighs against a finding of custody.[93]

Third, the investigation had not yet focused on Defendant at the time Defendant spoke with Agent Howey. At no point did the conversation between Agent Howey and Defendant escalate to "interrogation;" rather, Defendant asked to speak with Agent Howey and then stated that he had just been released from prison and he did not want to go back. Agent Howey asked him what he meant by that. Defendant then volunteered that he had a baggie of marijuana and a syringe in the Jeep, and that he did not want to go back to prison. Agent Howey then made one follow up question, asking if there was anything else in the vehicle. Defendant stated there was not, and began to jump up and down and use profanity. Agent Howey's questioning reflects the absence of knowledge of what had been located in the Jeep. Agent Howey simply permitted Defendant to tell him what he wanted, and posed only one, innocuous follow-up question.[94]

Fourth, Agent Howey immediately ceased further discussion at the request of Defendant. Once Defendant told Agent Howey that he would like to speak with a Layton police officer, all conversation with Defendant immediately ceased. This factor particularly illustrates the police's lack of intensive questioning such that a reasonable person would feel like they were bein subjected to a custodial interrogation.

---

[93] *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *see also Ritchie*, 35 F.3d at 1481 (finding no "formal arrest" while suspect "detained").

[94] *See Miranda*, 384 U.S. at 478 ("The fundamental import of the privilege [against compelled self-incrimination] while an individual is in custody is not whether he is allowed to *talk* to the police without the benefit of warnings and counsel, but whether he can be *interrogated*. . . . Volunteered statements of any kind are not barred by the Fifth Amendment.").

Fifth, Defendant initiated the conversation with Agent Howey. *Miranda* warnings are required whenever questioning is "initiated by law enforcement officers after a person has been taken into custody . . . ."[95] Here, the evidence demonstrates that Defendant, without prodding or prompting, specifically asked to speak with Agent Howey and then volunteered incriminating information. Because Agent Howey did not initiate any questioning and did not exert any pressure that could impair Defendant's right against self-incrimination, this factor also weighs against a finding of custodial interrogation.

Sixth, Defendant's conversation with Agent Howey was very brief, lasting only one to two minutes. Noticeably absent is protracted questioning over a lengthy period of time. Given the brevity of the questioning, Defendant could not have reasonably concluded he was in custody and entitled to *Miranda* warnings.

Seventh, Defendant's statements to Agent Howey were uncoerced. "There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question, as in this case."[96] Here, Defendant's statements to Agent Howey were freely given in response to Agent Howey's noncoercive questions.

A careful evaluation of the aforementioned factors reveals that under the totality of the circumstances test, Defendant was not in custody and therefore not entitled to *Miranda* warnings when he spoke to Agent Howey. Therefore, Defendant's statements to Agent Howey are admissible at trial.

---

[95] *Id.* at 444.
[96] *Oregon v. Elstad*, 470 U.S. 298, 312 (1985).

## Defendant's Retention of the Cell Phone Is Admissible

Defendant also challenges the admissibility of Defendant's retention of the cell phone. After law enforcement officers had conducted a search of the Jeep and had found a backpack containing rolling papers, a silver handgun, a cell phone, methamphetamine, marijuana, a scale, and clothing that included boxer shorts, they conferred regarding how to ascertain ownership of the backpack. They decided that Officer Weekes would return to the apartment and inquire whose cell phone was in the backpack. Officer Weekes returned to the apartment and asked who the cell phone belonged to. Mr. Vine stated it was not his, but Defendant manipulated the cell phone and then retained it. Defendant believes this series of events was a "ruse" craftily designed by law enforcement to elicit an incriminating response without first giving a *Miranda* warning. The officers, according to Defendant, conducted an "interrogation" (in the constitutional sense of that term) even though the questioning did not occur within the typical rubric of question-and-answer but rather by way of a cunning ploy to get Defendant to admit to ownership of the cell phone through his actions. Defendant has not cited any case law to support his position.

"[T]he mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion."[97] Here, it is not clear that Defendant even made an "admission" by taking and keeping the cell phone. But even if he did, there is no record of "deliberately coercive or improper tactics in obtaining the statement."[98] There was simply a conversation among officers about how to return the phone to the owner. Defendant does not establish how this conversation constitutes an improper "ruse" created by law enforcement officers. Thus, even if Defendant's action of taking and retaining the cell phone is considered an "unwarned admission," there is no reason in the record to presume it was obtained by compulsion.

---

[97] *Id.* at 314.
[98] *Id.*

Further, the record does not show that Defendant was subjected to a "custodial interrogation" when presented with the cell phone. He was not in handcuffs, the investigation had not yet squarely turned to the Defendant, there were no follow-up questions made after Defendant took the cell phone, the interaction was very short, and the door to the apartment remained open. All these factors weigh against a finding of custodial interrogation. The only factor that weighs in favor of finding a custodial interrogation is that there were multiple officers on scene. But such a fact, by itself, does not establish a custodial interrogation.[99]

Once presented with the cell phone, Defendant took it, manipulated it, and kept it—but did not state that the cell phone was his. This evidence is admissible at trial because there is no support in the record that the officers engaged in improper tactics in returning the cell phone to the Defendant, and the record does not show that Defendant was subjected to a "custodial interrogation" when presented with the cell phone. At trial, the parties will be free to present arguments to the jury about what should be inferred from Defendant's conduct when he took the cell phone, manipulated it, and retained it.

### Statements Made to Officer Weekes Are Admissible

Finally, Defendant argues that any statements made to Officer Weekes should be suppressed because law enforcement exploited prior *Miranda* violations. That is, even though Officer Weekes read Defendant his *Miranda* rights, the reading of those rights was ineffective because it occurred after information had been illegally obtained. Defendant provides no case law to support this position.

The prosecution does not dispute that Defendant's conversation with Officer Weekes occurred as part of a custodial interrogation, but disagrees with Defendant's position that Officer

---

[99] *Ritchie*, 35 F.3d at 1481 (concluding suspect not "in custody," even though several officers were present on the scene, because other factors weighed against finding of custody).

Weekes's reading of a *Miranda* warning was ineffective. The prosecution contends that by the time Defendant asked to speak with Officer Weekes, the investigation regarding the contraband found in the Jeep properly shifted to the Defendant, and Officer Weekes appropriately read Defendant his *Miranda* rights from a field card prior to any questioning. The prosecution points out that Defendant decided to waive his rights and continue talking to Officer Weekes. Therefore, the prosecution argues, any statements made to Officer Weekes are admissible.

The prosecution is correct.[100] Even if Defendant's prior statements to police were invalid under *Miranda*,[101] this would *not* have tainted any future statements made by Defendant to police. In *Oregon v. Elstad*, the Supreme Court held that even if a suspect makes a statement that must be suppressed under *Miranda*, "the admissibility of any subsequent statement should turn in these circumstances *solely on whether it is knowingly and voluntarily made*."[102] Here, Defendant cannot dispute that his statements to Officer Weekes were knowingly and voluntarily made. Even though police had not requested to speak with Defendant, Defendant approached and asked to speak with Officer Weekes and another officer. The officers agreed to speak with him and did so in the grassy area outside the apartment. Before the conversation began, Officer Weekes read to Defendant his rights per *Miranda* from a field card. After hearing the *Miranda* warning, Defendant stated that he still wanted to speak to Officer Weekes. By initiating the conversation

---

[100] *Elstad*, 470 U.S. at 310-311 ("[When considering] whether a properly warned confession must be suppressed because it was preceded by an unwarned but clearly voluntary admission, the majority [of courts] have . . . recognized that . . . a careful and thorough administration of *Miranda* warnings . . . conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'").

[101] This Memorandum Decision and Order holds that Defendant's statements prior to his conversation with Officer Weekes were *not invalid*. But for purposes of discussion, the possibility that they were not valid is explored in order to fully address Defendant's arguments.

[102] *Elstad*, 470 U.S. at 309 (emphasis added).

with Officer Weekes, and by voluntarily waiving his rights under *Miranda*, Defendant knowingly and voluntarily made statements to Officer Weekes that will be admissible at trial. There is no support for Defendant's position that prior events invalidated Officer Weekes's *Miranda* warning, or that Officer Weekes's conversation with Defendant was an "exploitation."[103]

### Evidence Found Pursuant to the Search of the Jeep is Admissible

Defendant challenges the admissibility of the evidence found pursuant to the search of the Jeep. However, this argument fails. The automobile exception to the warrant requirement permits law enforcement officers who have "probable cause to believe a car contains contraband [to] search the car without first obtaining a search warrant."[104] The Tenth Circuit has consistently held that "probable cause [to search a vehicle] can be based on alerts by trained dogs."[105] Here, a trained and certified dog alerted on the Jeep Defendant was driving. Therefore, police had probable cause to search the Jeep, and the evidence found pursuant to the search will be admissible at trial.

---

[103] *See id.* at 318 ("We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.").

[104] *United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007); *see also California v. Carney*, 471 U.S. 386, 392 (1985).

[105] *United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009).

**ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion to Suppress[106] is DENIED.

Dated May 11, 2015.

BY THE COURT:

David Nuffer
United States District Judge

---

[106] Motion to Suppress Evidence, docket no. 9, filed December 5, 2014.